UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 3:14-cv-01290 |
| ) | JUDGE CRENSHAW |
| $77,090.00 UNITED STATES ) | |
| CURRENCY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| TROY TOMPKINS and CHERIE ) | |
| BANKS, ) | |
| ) | |
| Claimants. ) | |

# MEMORANDUM OPINION

The United States has filed a Verified Complaint *In Rem* against $77,090 in currency seized at Nashville International Airport in January of 2014. (Doc. No. 1.) Troy Tompkins and Cherie Banks (collectively, "Claimants") have filed Verified Claims to portions of the funds. (Doc. No. 7; Doc. No. 8.) The United States filed a Motion to Strike Claimants' Claims (Doc. No. 12), a Motion for Default Judgment against all persons other than Claimants (Doc. No. 18), and a Motion for a Protective Order to Stay Government Response to Interrogatories and Request for Documents pending the resolution of its other pending motions (Doc. No. 20). Claimants have filed a Motion to Dismiss for Lack of Prosecution. (Doc. No. 23.) For the reasons discussed herein, the government's Motion to Strike Claimants' Claims is **DENIED**, its Motion for Default Judgment against all other persons is **GRANTED**, its Motion for a Protective Order is **DENIED**, and Claimants' Motion to Dismiss is **DENIED**. The Court will refer this matter to Magistrate Judge Alistair Newbern for the purpose of overseeing discovery and discovery-related disputes.

1

**I. BACKGROUND**

The United States relies on the affidavit of Matthew J. Moore, a task force officer ("TFO") with the United States Drug Enforcement Administration ("DEA"), to allege the facts surrounding the seizure of the funds at issue in this case. (Doc. No. 3.) According to TFO Moore, at approximately 11:00 AM on January 19, 2014, an explosive detection system at the Nashville International Airport alerted Transportation Security Administration ("TSA") personnel to a piece of luggage that had been checked for transportation to San Francisco, California. (Id. at ¶¶ 15, 22.) A tag identified the luggage as belonging to Claimant Tompkins. (Id. at ¶¶ 15–16.) Inside the luggage, the TSA found a brown mailing envelope and a white box, each of which held a vacuum sealed plastic bag containing currency bundled with plastic bands. (Id. at ¶¶ 17–18.) The envelope was addressed to Tompkins' girlfriend and fellow Claimant Banks at an address in Newberg, Oregon. (Id. at ¶ 19.) The box was addressed to Bradley Mejarg at an address in Junction City, Oregon. (Id. at ¶ 20.) Tompkins allegedly told law enforcement that the packages contained about $70,000, $50,000 of which was given to him by his mother and $20,000 of which represented profit from buying and selling cars and property. (Id. at ¶ 23.) When counted, the currency amounted to $77,090, mostly in twenty dollar bills. (Id. at ¶ 32.)

According to TFO Moore, investigators detected an obvious odor of marijuana from some portion of the seized materials, and a trained canine identified the currency as having the odor of narcotics. (Id. at ¶¶ 24–27.) TFO Moore further states that Tompkins' stepfather Ted Lang "advised that . . . Tompkins told him he was a money courier." (Id. at ¶ 33.) Tompkins was also involved in an earlier forfeiture of funds in December of 2012, when $169,271 of currency was seized from him during a traffic stop in Kansas involving a car allegedly belonging to Banks. (Id. at ¶¶ 7–12.)

To explain the source of the funds at issue in this case, Tompkins provided law enforcement with a five-page letter to him from his mother, Angel Tompkins, dated March 11, 2013, discussing a wide range of topics, including their respective dental work, the quality of Ms. Tompkins' recent bus ride, and events of Tompkins' childhood that were emotionally challenging for Ms. Tompkins, Claimant Tompkins, or both. (Doc No. 3-1.) Relevant to this case, Tompkins' mother also describes a gift of $59,800 dollars from her to Tompkins, made from funds she accumulated by saving $25 per week from mid-1968 through March 2013. The letter says that Tompkins' mother is giving Tompkins the money as "my appreciation for who you have become and chosen to grow up to be." (Id. at 4.) She discusses the possibility of Tompkins' investing the money in real estate: "I know you want to look at trailer parks or land[.] I would prefer horse property with land to grow special crops like vegetables, salad and herbs, baby squash or [edible] flowers[,] with great water rights and good open sunny plots." (Id.) The letter appears to be notarized by a commissioned California notary public. (Id. at 5.)

On February 26, 2014, each Claimant filed an administrative claim with the DEA related to the funds. Tompkins claimed an ownership and possessory interest in the entirety of the seized funds (Doc. No. 13-6), and Banks claimed an ownership and possessory interest in $10,000 (Doc. No. 13-7). On June 12, 2014, the United States filed its Complaint. (Doc. No. 1.) On August 1, 2014, Claimants filed separate claims in this Court opposing forfeiture. (Doc. No. 7; Doc. No. 8.) Tompkins' claim revises his earlier assertion of ownership of the full amount, instead asserting a possessory interest over all of the funds but an ownership interest in only $67,090, with the remainder belonging to Banks. (Doc. No. 7 at 1.) Banks' claim similarly asserts a possessory interest in all of the funds, but asserts ownership of just $10,000, with the rest belonging to Tompkins. (Doc. No. 8 at 1.)

The United States served claimants with special interrogatories related to the matter on November 7, 2014. Tompkins received twenty-seven interrogatories, seeking a wide array of information about his assets, sources of income, and associations, as well as the events surrounding the seizure. (Doc. No. 13-5 at 2–20.) A number of the interrogatories demanded that Tompkins both "IDENTIFY and DOCUMENT" the requested information. (E.g., id. at 3, 5, 7.) Banks received twenty-one interrogatories, generally requesting similar information. (Doc. No. 13-4 at 2–16.) Tompkins and Banks individually responded to the interrogatories on or around December 18, 2014. (Id. at 16; Doc No. 13-5 at 22.) While each provided some responsive details, they declined to produce the majority of the information requested, instead raising a number of objections, including the following: (1) the interrogatories improperly sought production of documents, which is not authorized by Rule G(6) (Doc. No. 13-5 at 3); (2) the subject matter of the interrogatories exceeded the scope of Rule G(6)(a) (Id. at 4); (3) some information sought was beyond the scope of permissible discovery because it was not relevant, admissible, or calculated to lead to admissible evidence (Id. at 5); (4) some interrogatories reflected an improper purpose and/or were unduly duplicative (Id. at 7); and (5) some interrogatories were overbroad, burdensome, and oppressive (Id. at 8).

According to Claimants' counsel, they heard nothing more from the United States about the objections until on or around July 1, 2015, when he contacted counsel for the United States on Claimants' behalf to inquire about the status of their claims. (Doc. No. 24 at 3; Doc. No. 24-1 at 1.) An additional month and a half later, the United States sent Claimants letters, dated August 18, 2015, taking issue with Claimants' interrogatory responses. Each letter alleged that the respective Claimant's response did "not appear to be a good faith answer" to the special interrogatories and warned that the Claimant's allegedly inadequate response "could be the basis

for a motion to dismiss after a hearing for lack of standing." (Doc. No. 13-8 at 1; Doc. No. 13-9 at 1.)

On November 17, 2015, the United States filed it motion asking the court to strike Claimants' claims due to their lack of constitutional or statutory standing (Doc. No. 12), and on February 24, 2016, it filed its motion for default judgment with regard to all nonclaimants (Doc. No. 18). In the meantime, Claimants served the United States with their own interrogatories, and the United States moved for a protective order staying its response. (Doc. No. 20.) On March 25, 2016, Claimants filed a motion seeking dismissal of the government's case based on its violation of their due process rights arising out of the government's failure to expeditiously bring the matter to trial. (Doc. No. 23.)

## II. MOTION FOR DEFAULT JUDGMENT

The United States asks the Court to enter a judgment extinguishing all interest, right, liens or title of any persons other than Claimants in the funds at issue pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure. The government in particular identifies Angel Tompkins and Bradley Meharg a/k/a Bradley Mejarg as persons to be covered by the judgment. Neither Angel Tompkins, Bradley Meharg, nor any other third party has come forward to challenge the government's motion.

"A judgment of forfeiture may be entered only if the government has published notice of the action within a reasonable time after filing the complaint or at a time the court orders." Supp. R. G(4)(a)(i), Fed. R. Civ. P. For property located within the United States, publication should be made either "in a newspaper generally circulated in the district where the action is filed, where the property was seized, or where property that was not seized is located" or "on an official internet government forfeiture site for at least 30 consecutive days." Supp. R. G(4)(a)(iv)(A), (C), Fed. R.

Civ. P. The government is also required to provide direct notice of the complaint "to any person who reasonably appears to be a potential claimant on the facts known to the government." Supp. R. G(4)(b)(i), Fed. R. Civ. P. Absent good cause to the contrary, a potential claimant who received direct notice must file his claim before the deadline established in the notice provided; if a potential claimant did not receive direct notice but notice was published on a government forfeiture website, he must file his claim no later than sixty days after the first publication. Supp. R. G(5)(a)(ii), Fed. R. Civ. P.

Bradley Mejarg was sent direct notice of these proceedings on June 27, 2014, and informed that he should file any claim within thirty-five days. (Doc. No. 16 at 2.) Notice of the action was also published to www.forfeiture.gov, where it remained published for at least thirty days beginning on June 18, 2014. (<u>Id.</u> at 3.) Because the time for any party to file a timely claim has long expired, the United States' motion for default judgment as to all persons other than Claimants will be granted.

### III. MOTION TO STRIKE

The United States argues that the Court should strike Tompkins' and Banks' claims because (1) they have not established adequate ownership, possessory, or security interests in the funds to provide standing to challenge the forfeiture under Article III of the Constitution; and (2) their inadequate responses to the interrogatories violate the Supplemental Rules governing forfeiture, depriving them of statutory standing.

**A. Standard of Review**

6

"In order to contest a governmental forfeiture action, [the] claimant[ ] must have statutory standing through compliance with [the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions], as well as the Article III standing required for any action brought in federal court." United States v. $677,660.00 in U.S. Currency, 513 F. App'x 531, 532 (6th Cir. 2013) (quoting United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 497 (6th Cir. 1998)). "Standing to assert a claim is a threshold issue . . . , and it is claimant's burden to establish that she has both statutory and Article III standing to contest the forfeiture." United States v. $25,982.28 in U.S. Currency, No. 5:14 CV 150, 2015 WL 410590, at *2 (N.D. Ohio Jan. 29, 2015) (citing United States v. Four Thousand Two Hundred Seventy–Eight Dollars, No. 12-10253, 2014 WL 3420774, at *3 (E.D. Mich. July 14, 2014)).

## B. Constitutional Standing

If a plaintiff does not have constitutional standing to bring a claim, then a federal court is truly without power to rule on the issues presented. See Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 475–76 (1982) ("[O]f one thing we may be sure: Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States."). The constitutional standing requirement arises out of the limitation of the courts' power to "cases and controversies" by Article III of the United States Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–61 (1992). In order to have standing: (1) the plaintiff or claimant must have suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision. Id.

In the context of a claim in an *in rem* forfeiture proceeding, the standing requirement means that "a claimant must have a colorable ownership, possessory or security interest in at least a portion of the defendant property." $677,660.00, 513 F. App'x at 532 (citing $515,060.42, 152 F.3d at 497). "Colorable" is generally defined as "appearing to be true, valid, or right." *Colorable*, Black's Law Dictionary (10th ed. 2014). In another context, "colorable" has been described as a "low threshold" that does not require the party asserting the colorable argument to prove that he will ultimately prevail. Green v. Fornario, 486 F.3d 100, 107 (3d Cir. 2007). By the same principle, "[a] claimant need not prove the merits of his underlying claim," but only "'a facially colorable interest . . .' to satisfy the requirements of standing." United States v. Salti, 579 F.3d 656, 667 (6th Cir. 2009) (quoting $515,060.42, 152 F.3d at 497–98).

Nevertheless, courts have developed some safeguards particular to the unique problems associated with standing to challenge the civil forfeiture of property alleged to be linked to criminal activities. "'[D]ue to concerns about straw man transfers' from criminals to third parties who lack any legal interest, 'naked possession' claims are insufficient to establish standing." $677,660.00, 513 F. App'x at 532 (quoting $515,060.42, 152 F.3d at 498). Rather, the person in possession of the funds must offer "some explanation or contextual information regarding the claimant's relationship to the seized property." Id. (quoting $515,060.42, 152 F.3d at 497–98).

The United States argues that Claimants lack standing because they have not established a colorable claim that Tompkins possessed the funds as anything other than a money courier for unidentified true owners. Presumably in recognition of the fact that Tompkins has, in fact, provided some contextual information regarding his possession of the funds, the government relies on what it refers to as a prima facie case that he was instead a courier. The government premises its claimed prima facie case that Tompkins is a mere courier on the following: (1) the vague,

8

unelaborated hearsay statement of his stepfather to that effect, as recounted by TFO Moore; (2) Tompkins' involvement in the earlier forfeiture; (3) his "changing story" about whether $10,000 of the funds belonged to Banks; (4) his initial statement that the funds amounted to about $70,000, when in fact they were $77,090; (5) his lack of knowledge about how much currency was in each package; and (6) the letter from his mother, which the government characterizes as "rambling" and "preposterous." (Doc. No. 13 at 20.)

A single hearsay statement from a family member presenting no foundation, explanation, or details, recounted by law enforcement, is not sufficient to establish that Tompkins was a courier, let alone was acting as a courier in this particular instance. What remains is the government's circumstantial case. At most, however, Tompkins' involvement in an earlier seizure of funds suggests that he may have been historically involved in or associated with the drug trade. It says nothing about whether he is a courier or whether, in contrast, he may have been, for example, a passive companion or unwitting dupe in whatever transactions were at issue. Similarly, although his underestimating the amount of money in his possession could be seen as consistent with him serving as a courier, it also could be the result of mere inattentiveness on the part of someone dealing with a large amount of cash.

The confusion about whether Tompkins had an ownership interest in the $10,000 ultimately attributed to Banks can similarly be explained by poor accounting. Banks herself says that she gave Tompkins $10,000 she received from an insurance payout for him to invest. (Doc. No. 13-4 at 10.) That Tompkins was temporarily mistaken about what cash was his may not reflect well on him as an investment partner, but falls far short of establishing or even significantly suggesting that he was a courier—particularly in light of the Claimants' alleged romantic relationship, which might explain a certain degree of informality with regard to their pooled

finances. The strange manner in which the funds were physically divided is perhaps more obviously suspicious of courier activity, but again, all Tompkins and Banks must do is establish a facially colorable claim. The government will have ample opportunity to press this argument on the merits, should the case proceed.

The government's reliance on the letter from Tompkins' mother is especially puzzling. On its face, the letter provides an innocent explanation for Tompkins' possession of the funds and would seem, if anything, to support his claim of standing. By the government's reasoning, though, the very fact that Tompkins has provided documentation of a licit reason for possession of a large amount of cash is evidence that the possession was illicit: who, the government asks, bothers to possess evidence that he is not a criminal courier, but a criminal courier? This is the very definition of a catch-22.[1] While the government is free to make such an argument in support of the forfeiture, its logic is not so inexorable that it deprives Tompkins of even a facially colorable claim.

As to the contents of the letter, the premise that a mother would save a small amount of money weekly over many years, then give it to her adult son, does not strike the Court as so facially preposterous that it can be dismissed out of hand. It is moreover lost on the Court what significance there could be to the fact that the government considers the letter "rambling"—a term it sees fit to use twice. (Doc. No. 13 at 4, 20.) The government's aesthetic objections aside, a loose and informal style would seem, if anything, consistent with the veracity of the letter. Finally, and perhaps most importantly, the government's argument here suffers from the same flaw as its reliance on the prior forfeiture: the United States has conflated having forfeitable cash with being

---

[1] See Stuard v. Stewart, 401 F.3d 1064, 1068 n.8 (9th Cir. 2005) (explaining that "Catch-22" first referred to the fictional policy, in the novel of the same name, whereby a pilot's request to be grounded was taken as proof that he was not entitled to be grounded).

a courier, when both history and common sense dictate against such a leap. Even if the United States is correct and Tompkins obtained the letter from his mother to defeat a potential future forfeiture, that says nothing about whether he was concerned about the forfeiture of *his* funds or *someone else's*.

Based on the materials before the Court, Tompkins has established a colorable claim that the funds were his and Banks's. Further evidence and fact-finding could, of course, undermine that colorable claim, and the Court's ruling in no way prevents the government from continuing to argue that Tompkins was a money courier. At this stage, however, Tompkins' possession of the funds, his proffered explanation for where they came from, and the lack of any detailed, admissible direct evidence suggesting that Tompkins was specifically a courier—as opposed to being merely generically associated with criminal activity—are sufficient to make his and Tompkins' claims constitutionally permissible for the Court to consider. The Motion to Strike will therefore be denied with regard to constitutional standing.

## C. Statutory Standing

Pursuant to 21 U.S.C. § 881(a)(6), the United States has the authority to initiate *in rem* civil forfeiture proceedings against "[a]ll moneys . . . or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . intended to be used to facilitate any violation" of the Controlled Substances Act. Once *in rem* proceedings are initiated, "any person claiming an interest in the seized property may file a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims." 18 U.S.C. § 983(a)(4)(A). To sustain such a claim, however, the claimant must show that he has what has come to be referred to as "statutory standing," which is premised on his compliance with those

Supplemental Rules. See, e.g., United States v. $5,730.00 in U.S. Currency, 109 F. App'x 712, 713 (6th Cir. 2004) ("Statutory standing is achieved by strictly complying with Federal Rule of Civil Procedure Supplemental Rule for Certain Admiralty and Maritime Claims C(6) . . . ."); $515,060.42, 152 F.3d at 497 ("In order to contest a governmental forfeiture action, claimants must have statutory standing through compliance with Supp. Admiralty and Maritime Claims R. C(6) . . . ."); United States v. Currency $267,961.07, 916 F.2d 1104, 1108 (6th Cir. 1990) ("[C]laimant's failure to strictly adhere to Supplemental Rule C(6) precludes the requisite statutory standing to contest a government forfeiture action."); United States v. 2006 Dodge Charger SRT-8, No. 3:09-CV-518, 2011 WL 2601028, at *1 (E.D. Tenn. June 30, 2011) ("Statutory standing is established through strict compliance with Supplemental Rules G(5) and G(6)." (quoting United States v. Vehicle 2007 Mack 600 Dump Truck, VIN 1M2K189C77M936428, 680 F. Supp. 2d 816, 822 (E.D. Mich. 2010)).

Among the rules with which a claimant must comply is Supplemental Rule G(6)(a), which permits the United States to "serve special interrogatories limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." See Supp. R. G(8)(c)(i)(A), Fed. R. Civ. P. (providing that the government may move to strike a claim for failure to comply with Rule G(6)). The claimant must provide "[a]nswers or objections to these interrogatories" within twenty-one days after he was served. Supp. R. G(6)(b), Fed. R. Civ. P. The United States argues that the Claimants failed to make a good faith effort to comply with this rule, and that in so doing they have deprived themselves of statutory standing to assert their claims to the contested funds.

Claimants argue first that the Sixth Circuit's statutory standing jurisprudence has been effectively overruled by Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377,

12

1386–88 (2014). In Lexmark, the Supreme Court observed that several doctrines that have come to be discussed under the rubrics of either "prudential" or "statutory" standing are not ultimately doctrines of standing at all, but rather, if anything, substantive limitations on the relevant causes of action. Id. at 1387 n.3 & n.4. As the Court observed, the requirement of standing is a limitation on the federal courts' "*power* to adjudicate [a] case." Id. at 1387 n.4. Many so-called "prudential standing" or "statutory standing" inquiries, on the other hand, are not concerned with the limits of the court's power, but whether Congress has authorized a particular plaintiff to bring the claim at issue. Id. at 1387–88; see Galaria v. Nationwide Mut. Ins. Co., No. 15-3386, 2016 WL 4728027, at *5 (6th Cir. Sept. 12, 2016) ("If a plaintiff lacks statutory standing—in other words, does not have a cause of action—the proper course is to dismiss for failure to state a claim."). For example, an individual outside the "zone of interests" of a regulation cannot file suit challenging that regulation under the Administrative Procedures Act ("APA"), but that bar—despite historically having been considered one of "prudential standing"—has nothing to do with the Court's power, but merely whom Congress has granted a cause of action under the APA and whom it has not. Lexmark, 134 S.Ct. at 1387–89.

Consistently with the Lexmark critique, none of the statutory standing cases relied upon by the United States appear to be truly concerned with the Court's power to adjudicate a case, rendering the term "standing" perhaps inapposite or at least potentially confusing. The Court is not persuaded, though, that Lexmark sweeps away all of the existing Sixth Circuit precedents establishing that a claimant may forfeit his claim for noncompliance with the Supplemental Rules. The point of Lexmark's critique is not that all of the doctrines that have come to be known as presenting "prudential" or "statutory" standing rules are improper and should be forgotten. See In re City of Detroit, Michigan, 838 F.3d 792, 800 (6th Cir. 2016) (declining to read Lexmark as

13

abolishing the doctrine of equitable mootness). Rather, Lexmark reminds the courts that, misnomers aside, statutory and prudential standing doctrines should not be confused with the jurisdictional limitations associated with a true lack of standing.

The case law of the Sixth Circuit, then, is still that—regardless of what term one wants to use for the rule—a failure to comply with the Supplemental Rules can cost a claimant his statutory right to challenge a forfeiture. Even that case law, however, recognizes flexibility in how the Court should apply such a bar, at least where noncompliance can be rectified through the ordinary course of litigation. In United States v. Currency $267,961.07, 916 F.2d at 1109, for example, the Sixth Circuit reversed a district court's dismissal of a claim for *inter alia* failing to comply with the verified complaint requirement of Supplemental Rule C(6), instructing the court instead to undertake a Rule 15 balancing analysis to determine whether claimants should have been permitted to amend their complaint. See also United States v. $22,050.00 U.S. Currency, 595 F.3d 318, 323 (6th Cir. 2010) (recognizing some district court discretion to "determine whether to excuse noncompliance" with the supplemental rules). In fact, even the district court case most supportive of the government's position tacitly acknowledges that it may in some cases be proper to allow a plaintiff to rectify his noncompliance: in United States v. $25,982.28 in U.S. Currency, 2015 WL 410590, at *3, the claimant failed to respond to interrogatories for four months, leading the court to dismiss the claim for lack of statutory jurisdiction—but only after concluding that "it is evident to the Court that additional time would not produce a different result."

Disputes over what one party may compel another to produce are a routine part of litigation and, most of the time, do not result in a party's claims being wholly stricken or dismissed. In ordinary civil discovery, for example, the first step in the face of a disagreement between the parties is to engage in a "good faith effort to resolve by agreement the issues raised." Local R.

14

37.01(b)(3); see also Fed. R. Civ. P. 37(a)(1). If the parties are unable to resolve the dispute between them, the party propounding the request may file a motion to compel. Fed. R. Civ. P. 37(a)(1), (3). If the Court grants the motion, and the subject party fails to comply, the Court may consider a wide array of sanctions. Fed. R. Civ. P. 37(b). Although one possible sanction is dismissal of the party's claim, a Court will only resort to dismissal if it determines that such a step is warranted in light of the balancing of a number of factors, including "whether the dismissed party was warned that failure to cooperate could lead to dismissal" and "whether less drastic sanctions were imposed or considered before dismissal was ordered." See Barron v. Univ. of Mich., 613 F. App'x 480, 484 (6th Cir.) (citing United States v. Reyes, 307 F.3d 451, 458 (6th Cir.2002)), cert. denied, 136 S. Ct. 416 (2015).

The Advisory Committee's Note to the 2006 adoption of Rule G provides that "the special role that subdivision (6) plays in the scheme for determining claim standing may justify a somewhat more demanding approach to discovery sanctions than Rule 37." A "somewhat more demanding approach" however, does not require zero tolerance for error or overreach. That same Advisory Committee's Note cautions that "[n]ot every failure to respond to subdivision (6) interrogatories warrants an order striking the claim." Cf. United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar Cal., Trinity Cty., 787 F.3d 968, 977 (9th Cir. 2015) (holding that "where a claimant's Article III and statutory standing are not reasonably in dispute, his failure to respond to Rule G(6) special interrogatories does not, in itself, warrant striking his claim"); United States v. $154,853.00 in U.S. Currency, 744 F.3d 559, 564 (8th Cir. 2014) (reversing dismissal of claim for failure to respond to Rule G(6) interrogatories on ground that claimant had established standing, rendering interrogatories unnecessary). That caveat is particularly relevant where, as here, the Claimants did not ignore or refuse to respond to the

government's interrogatories, but merely responded with objections that the government has deemed unfounded, overzealous, or overbroad.

Faced with Claimants' objections, the United States could have come to this Court with a motion to compel Claimants to provide the information it demands. Such a motion would have entitled it to an adversarial consideration of Claimants' objections and a judicial determination of what information Claimants are or are not required to produce. Instead, the government seeks to skip ahead to the harshest possible sanction, striking of Claimants' claims. Nothing in the Supplemental Rules, the precedents of this Circuit, or the interest of justice mandates such a draconian response. Nor can the Court see what purpose such an unyielding regime would serve, other than to discourage future claimants from objecting to interrogatory responses out of fear that an adverse ruling would cost them not merely their rights to withhold information but their claims altogether.

Accordingly, the Court will refer this matter to Magistrate Judge Newbern for the purpose of consideration on the merits of any discovery disputes arising either out of the government's special interrogatories or any other discovery in this matter. Despite the government's unilateral assertion that "the time for discovery in relation to standing is over," (Doc. No. 13 at 21) the plain language of Rule G(6)(a) permits discovery related to standing to continue and special interrogatories to issue "at any time . . . before discovery is closed." Discovery related to the merits of this case is still pending, which should provide ample opportunity to resolve any issues related to discovery relevant to standing as well. If the United States wishes to continue to assert the inadequacy of Claimants' responses, it is instructed to file a motion to compel, after it complies with Local Rule 37.01(b)(3). If, after the Magistrate Judge rules on the motion to compel, Claimants' objections are held to be unfounded and Claimants still refuse to produce the requested

16

information, the United States may renew its request for dismissal of the claims due to noncompliance with the Supplemental Rules.

Because general discovery and Rule G(6)(a) discovery will—as expressly contemplated by the Rule—be proceeding simultaneously, the government's Motion for a Protective Order will be denied.

## IV. CLAIMANTS' MOTION TO DISMISS

Claimants argue that the United States' delays in bringing this matter to trial amount to an unconstitutional deprivation of their right to due process. An individual whose property has been seized and is being made subject to forfeiture by the United States has a Fifth Amendment "due process right to be heard at a meaningful time." United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency, 461 U.S. 555, 564 (1983). The Supreme Court has held that the four-factor balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972), for evaluating speedy trial claims is also appropriate for claims that the government unreasonably delayed its initiation of forfeiture proceedings. Eight Thousand Eight Hundred & Fifty Dollars, 461 U.S. at 564. The United States appears to concede that the same four-factor inquiry can be applied for due process claims based on delays that occurred *after* the initial forfeiture complaint was filed. (Doc. No. 29 at 6.) Under Barker, the Court determines if the delay was unreasonable by considering "[1] the length of the delay, [2] the reason for the delay, [3] the claimant's assertion of his right, and [4] the prejudice to the claimant." United States v. Ninety-Three Firearms, 330 F.3d 414, 424–25 (6th Cir. 2003) (citing Barker, 407 U.S. at 530). Although each factor serves a purpose, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Id. (quoting Barker, 407 U.S. at 530).

17

The delay in this case has, in the view of the Court, been long enough to at least raise the specter of a due process violation if that delay had been wholly unjustified. The funds were seized three years ago and the Complaint filed two and a half years ago. That Claimants have not yet had a chance to challenge the forfeiture on the merits warrants some explanation. Most of the delay since at least late 2015, however, has been due to the impasse over the adequacy of Claimants' interrogatory responses. Claimants portray this impasse as merely the result of the government's "frivolous" positions in its motion to strike. (Doc. No. 35 at 2.) To the contrary, the government advanced an aggressive position based on a colorable reading of the case law—just as Claimants have advanced an aggressive position with regard to the degree of protection they are entitled to against special interrogatories. Given that the impasse between the parties was occasioned at least in part by litigation decisions made by Claimants themselves, the delay strikes the Court as sufficiently justified to avoid running afoul of due process. The Court moreover does not consider the prejudice to the Claimants so great, nor their own efforts to speed along the proceedings so overwhelming, as to overcome this legitimate ground for the moderate delay. Claimants' motion will be denied.

## VI. CONCLUSION

For the foregoing reasons, the government's Motion to Strike Claimants' Claims will be **DENIED**, its Motion for Default Judgment against all other persons will be **GRANTED**, its Motion for a Protective Order will be **DENIED**, and Claimants' Motion to Dismiss will be **DENIED**.

The Court will issue an appropriate Order.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE